Good morning. May it please the Court, Armin Skalmowski present for Petitioner Runtuwene. I'd like to reserve two minutes for rebuttal. In this case, the BIA abused its discretion in not reopening Petitioner's motion to reopen based on changed circumstances in Indonesia. Could you please keep your voice up? Yes. Thanks. A little background on this case. Respondent, sorry, Petitioner last entered the United States in 1990. He's been here about 22 and a half years. He's got two United States citizen children, ages 14 and 13. The only relatives he has in Indonesia are his mother and his sibling. This case, we believe this case, the key to this case is the Tampu Bulon case, which can be found at 610 F. 3rd, 1056. Petitioner falls under the disfavored group category. As this Court knows, the more evidence of group targeting an applicant proffers, the less evidence of individually specific evidence needs to satisfy his burden of proof, in this case, to reopen this case. Petitioner included in his application for the reopening a statement that discusses why he wishes to reopen the case. He mentions that the persecution of Christians in Indonesia has intensified and has become much more widespread since his last hearing before the immigration judge. He fears his family would be persecuted on the account of his religious beliefs. He fears being attacked by Muslim extremists. He mentions churches, home fellowships, Christian businesses have been attacked by Muslim extremists more than at the time that he applied for asylum. What brought your client to the attention of the authorities in the first place? It was the NCERS program in 2003, where the countries from predominantly Muslim countries had to register with the government. And that's where he was brought to the attention of the authorities. And he was arrested and given an NCA notice of appearance and was then sent to immigration court. He registered? He registered voluntarily, yes. And once registered, they realized that he was here without papers? Right, he fell into the category of the, I think it was like 10 countries that had to register after 9-11. And they noticed right away that he had been here since 1990 without permission, overstayed his visa. He was illegal, so to say. So they put him in proceedings. Is there anything in the record as to criminal activity and so on? Absolutely not. I mean, he, the judge even mentions briefly because he also at the time applied for cancellation of removal for non-permanent residence. And in order to qualify for that, you had to show good moral character and also have no convictions. And the judge in her decision makes no mention of that and says that he qualifies for at least three of the four prongs for cancellation at the time. And that was, two of the prongs were no criminal conduct, no arrests, good moral character. Okay. So anyway, he also talks about his two U.S. citizen children. And he states that due to their prolonged residence in the United States, that if they were to return to Indonesia, they would be viewed as Westerners and foreigners subject to attack by radical Muslims or extremist Muslims. And what he also mentions in his plethora of background information found approximately from pages 31 all the way through 65, he talks about the, he shows that the government in Indonesia has now become almost a partner, you could say, or has, turns a blind eye to the Muslim extremists when they target the minorities, in particular the Christians. He in particular points to the travel warning that is submitted with the motion to reopen. It talks about how Americans are urged to maintain a low profile and be vigilant about security at all times. It says that terrorists are targeting American citizens, residents, visitors, students, tourists, and tactics included, but are not limited to kidnapping, shooting, poisoning. And he fears that his children would fall into this category also, as well as himself, who is a Christian, and as a member of a disfavored group, would also fall into this category. And that's something that he didn't really talk about at his first individual hearing in 2004. And that's what he thinks has changed since then. When did that travel warning first go into effect? There is a travel warning I did see in the record back in 2003. However, the difference between the one that he submitted and the motion to reopen is it appears that the government is more, the first travel warning talks about the conflicts between the Muslims and the Christians in certain areas after Suharto had fallen in 1996 and he ate. The second one talks about the government turning a blind eye and not enforcing their laws that they claim that they have in their constitution. And this one is the one he submitted, I believe 2008 travel warning for Indonesia, which is contained in the record. What does that say? Well, as I mentioned, Your Honor, it talks about Americans. And we have two Americans here. Basically, they're urging them to maintain a low profile, to basically hide, because they need to be vigilant at all times based on the security issues. They talk about places of worship that are targeted. Yeah. And these are devout Christians. I mean, they mention actually in their motion to reopen. So conditions aren't the same as they were originally. They're not the same as they were. And they've gotten worse. And what was bad before continues on to this day. Correct. And actually it hasn't lessened or been ameliorated. It's just there. It keeps going. And arguably gotten worse. I mean, on page 47, the Barnabas Fund talks about, you know, that after 10 years of calm, you have an alarming surge of Islamists threatening to kill Christians, church members, Christians involved in church activities. And I think this case is quite simple, Your Honors. I believe this Temple Bolan also fits in the category of the individualized harm that they could face. Briefly, the BIA mentioned that there was no distinct harm that they were going to suffer. But as we mentioned in our brief, what's distinct about this case versus the Christians that reside in Indonesia is that they have to cut the heads off of three girls. That happens, too. That's well documented. But tell me again, how did they get these folks get to the attention of our government? It was the national ‑‑ I think the acronym is NSEERS, N-S-E-E-R-S. I think it was the National Registration Program for countries that had predominant Muslim populations had to register after 9-11 with the government. And Indonesia is a prominently Muslim country, 90 percent Muslim. They had to register between April ‑‑ between February 1st and April 25th, 2003. And he did that. And even the NTA, I believe it's in the record, page 343, even shows that he's basically being processed by the Los Angeles, at the time the INS, and given to the NTA to appear for court. That's how he got to the attention of the authorities. He didn't file affirmatively. He filed defensively, actually, the first time. How many people registered? The Indonesian community actually was very compliant. The majority of them did register when ‑‑ Most people are compliant. But they happen to be surprisingly ‑‑ Except in these days, people are not that compliant. True. But actually, even we hear from the immigration judges in court that they're so impressed how these Indonesians, these very religious people, and most of them are Christian, that live in the United States, very compliant with when the government asks them to turn themselves in, they turn themselves in. Some applied for asylum affirmatively. Some went to the government offices to be registered and briefly arrested and then released and then sent to immigration court. That's what happened in this case. We're about 10 years after that initial registration. Yeah. We're about 10 years. We're exactly 10 years after the initial registration. Correct? Right. Do you want to save? You're a little over time. Yes, Judge. Why don't we hear from the government? Sure. Thank you. Good morning. May it please the Court. Jan Redfern on behalf of Respondent and the Attorney General. Your Honors, this is Petitioner's, as you're aware, second time before this Court claiming a religious persecution in Indonesia. In 2008, this Court denied this Petitioner's claim, holding that, first, he did not suffer any past persecution in Indonesia,  eligibility for withholding under either the pattern in practice or the disfavored group analyses. And the Court also held that substantial evidence supported the denial of cap protection for this Petitioner. In this petition, he seeks review of the Board's denial of his untimely motion to reopen, again claiming religious persecution in Indonesia. The Respondent would ask the Court to deny the petition for review because the Board Why don't you just talk to us? You don't have to read anything. Yes, Your Honor. All right. We would ask that the Court deny the petition for review because Petitioner, again, fails to demonstrate for a late motion to reopen any changed country conditions in Indonesia that would warrant an exception to the timely filing of a motion to reopen. And the Board here correctly determined that a motion to reopen was not warranted for a couple of reasons. First of all, he did not show that he was eligible for asylum and withholding of removal. There's nothing in his motion to reopen that changed that result from the very first Board decision in this case. He never claimed past persecution or even mistreatment of himself or his family members in Indonesia. And he doesn't claim that anywhere along the agency decisions or in his petition for review. As to his claim of future persecution, this Court held that in the prior petition for review, again, that he didn't show even as a member of a disfavored group or a member of pattern and practice analysis that didn't apply to this petitioner. And as Petitioner cites out the Court's case in Tampu Bolon, which does say that Indonesian Christians are a disfavored group, but that does not help this petitioner for a couple of reasons. First of all, he's filing a late motion to reopen, so he has to demonstrate changed country conditions in Indonesia. And secondly, even if he were a member of the disfavored group, he still has to show some individualized risk of persecution. And he's never articulated what that risk is. Because there's no past mistreatment of him, there's no indication that he would be singled out or targeted for future persecution in Indonesia. Well, you know, he's a Christian, and there's a whole history of Christians being persecuted and killed and churches being destroyed in that country. Yes, Your Honor. And it goes on and on and on. Yes, and in Tampu. So what else does he have to show? He has to show an individualized risk of persecution. And this Court in Tampu Bolon. Well, he says he's been in this country, what, 23 years now. He's got his wife is here, and they both work. He works in a hospital, and the capacity is a nurse. And we need nurses in this country, maybe more than doctors. We need nurses. And he's never been in any trouble. He's got two American-born daughters. That doesn't warrant suspension of removal. If you're talking about prosecutorial discretion, Your Honor, is that what you're referring to or the merits of his case? No, you know, government with a heart. That's what I'm talking about. Yes, Your Honor. And this case was reviewed for prosecutorial discretion. We did have mediation in the case, and the government. Yeah, but that doesn't mean much because the world is changing, you know. Yes, Your Honor, and the case was reviewed. And all those factors were considered. Yeah, when did that go on? Mediation was in May of last year, Your Honor. Yeah, but things have changed since then. We're kinder. We're trying harder to help people. And so what about the children? They go back there. They're U.S. citizen children. They don't have to return to their city. Oh, they don't have to return. They can wander the streets here without mama and without papa. What's that going to do to our country? They're going to help us. Your Honor, DHS did review this case for prosecutorial discretion, and given all the factors in the case, the fact that he's been here illegally for 20 years and that he has U.S. citizen children. And the government made a good faith effort during mediation to determine. Were you the counsel who represented the government during the mediation last year? Was it a different attorney? I was the counsel, yes, Your Honor. You say you were the counsel? I was, yes. The mediation didn't last very long. It was referred on May the 8th, and we get a note from an order from the mediator less than a month later that mediation has failed. It doesn't sound like there was much mediating going on. It sounds as though what the government said is, uh-uh, we're not doing it. Well, I can't obviously, as you know, divulge what happened during the mediation, but I would say we did make an attempt to determine whether the case was eligible for prosecutorial discretion, and DHS determined at that time that it was not eligible for a number of reasons. But, you know, we've had a number of cases where, under the Norton factors, we sent to mediation, got turned down. Now some of those same cases we send back again, they get granted. Right. And the government is perfectly willing, if the court desires to send this back to mediation, we can make another good-faith attempt during mediation to determine if DHS would like to exercise prosecutorial discretion in this case. I have no problem with recommending that if the court wants to. Again, given that, as you mentioned, prosecutorial discretion is an evolving concept and times have changed. Evolving concept. Yes. I like that. Yes. I like the Constitution, which is permanent. Correct. Yes. So that is an option if the court feels that this Petitioner should be granted some relief. Aside from the merits of the case, then the government is perfectly willing to return to mediation and attempt to renegotiate that. But if there are no further questions. Are you going to be there? Yes. Yes, Your Honor. I will still represent Respondent in this case during mediation. Oh. If there are no further questions. I mean, do you feel better about all this now? Certainly, Your Honor. Yes. What? What did you say? Are there no further questions? No, I asked do you feel better about all this. And I said certainly, yes, Your Honor. Oh, okay. Yes. I left my hearing aids in the back room, so. Thank you. I'll have to get them. Thank you. All right. Just one brief comment, Your Honor. I believe in Tampul Bolon this Court did say that there is individualized risk if family members send, have to return to Indonesia with their U.S. citizen children. I believe footnote six in Tampul Bolon refers to that individualized risk. So counsel saying there's no individualized risk I think is not correct. Because in Tampul Bolon, the Court did remand for that reason. Because the Court said that we must remand to the BIA for it to determine whether the combination of this favor group evidence and evidence of individualized risk is sufficient to establish the clear probability of persecution. And then footnote six says the record reflects that petitioner's family members continue to live in Indonesia, but that unlike their family members, petitioners would return westernized to Indonesia after living in the United States for over 20 years and raising two U.S. citizen children. So that footnote indicates to individualized risk of harm that they would suffer if they were to return. That's what Tampul Bolon says. Nobody's arguing about that. Well, the counsel said there was no individualized risk. Well, anyhow, it's a new world. You heard that, didn't you? You know how to read between the lines. Absolutely, Judge. Thank you. All right. Thank you. All right. Go in peace.
judges: Pregerson, Fletcher, Nguyen